Filed 9/13/13  Juan C. v. Super. Ct. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JUAN C.,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et. al.,<br><br>    Real Parties in Interest. | G048507<br><br>(Super. Ct. No. DP021497)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Jacki C. Brown, Judge.  Petition denied.

Lawrence A. Aufill for Petitioner.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Yana Kennedy for Minor.

*     *     *

Juan C. (father) seeks extraordinary writ relief from an order terminating reunification services for his son M.C. (born July 2011) and setting a selection and implementation hearing under Welfare and Institutions Code section 366.26 (all statutory references are to this code) hearing for September 20, 2013.  (Cal. Rules of Court, rule 8.450.)  Father contends there is insufficient evidence to support the juvenile court's finding that returning M.C. to father's physical custody would create a substantial risk of detriment to his physical or emotional well-being.  Father also challenges the sufficiency of the evidence to support the court's conclusion father was offered or received reasonable reunification services.  Finding no error, we deny the petition.

I

FACTS AND PROCEDURAL BACKGROUND

On July 24, 2011, Los Alamitos police received a report of a woman acting erratically outside a homeless shelter.  Officers observed N.L. (mother) swinging newborn M.C. by the lower body, causing his head to flop dangerously back and forth.  Mother proclaimed she was "dancing for the Gods and here is my sacrifice for the Gods."  Mother was unkempt, and appeared to be under the influence of drugs or alcohol.  Mother dropped the infant to the ground and kicked him, causing him to flip over.  M.C. suffered serious injuries, including internal brain bleeding, requiring hospitalization in a surgical intensive care unit.

The officer arrested mother for child endangerment and other offenses.  A social worker with the Orange County Social Services Agency (SSA) interviewed mother later at the jail.  Mother denied harming M.C., but acted erratically during the interview, and threatened the social worker.  Mother told the social worker M.C.'s "father was in

2

heaven" and the social worker "should ask Moses to send the father down to pick up the child."[1]

The social worker located father two days later. He and mother were not married, but had been together for about 18 months, and he was with mother shortly before the precipitating incident. Father revealed he suffered from depression and had been hospitalized five times for mental health issues. Homeless and living a transient lifestyle, he declared he could not currently care for an infant.

SSA filed a dependency petition alleging M.C.'s mother intentionally inflicted serious physical harm to him, his parents failed to protect him or provide him with adequate care, leaving him without support, and his parents suffered from mental illness. (§300, subds. (a), (b), (e) & (g).)

SSA placed M.C. in a foster home upon his release from the hospital. The social worker discussed the allegations of the petition with father in mid-August 2011. Father stated he noticed a lump on the back of M.C.'s head about a week before the incident. Mother claimed she did not know how it occurred. Before the incident, mother had been acting erratically and had refused to take her medication. On the day mother injured M.C., she struck father during an argument. He took the baby back to the shelter, but the manager "shut the door in" his face. He left M.C. with mother and returned to Santa Monica.

About a year elapsed between the detention hearing and the jurisdiction hearing. During this period, M.C. manifested significant developmental, neurological, and cognitive deficits. He initially required phenobarbital because of tremors, possibly

---

[1]    In July 2012, mother pleaded guilty in a collaborative court proceeding to assault by means of force likely to cause great bodily injury, corporal injury on a child, child abuse and endangerment, and battery on a police officer. The court placed her on probation in the "Whatever It Takes" program for mentally ill and homeless persons. The juvenile court declined to offer mother reunification services. She is not a party to this writ proceeding.

caused by in utero drug exposure, and required hours of physical and occupational therapy and other services weekly.

Father briefly relocated to an Orange County shelter, but soon returned to Los Angeles County. Father recommended a paternal aunt in Florida as a placement resource. The aunt reported father "had a very difficult life since childhood." Both of father's parents had mental health problems or substance abuse issues. Father was left to "fend for himself on the streets at age 14."[2]

SSA gave father bus passes and arranged weekly monitored visitation, but father visited M.C. infrequently. During visits, he often demonstrated poor parenting skills and appeared to "lack [] understanding of the child's severe developmental delays." Despite instruction from the monitors, father did not "engage with [M.C.], talk to him, smile at him, etc." He did not ask questions about M.C.'s condition and it was "concerning . . . that he doesn't take more of an interest . . . ." At one point father declared he was "not gonna go see [M.C.] ever again." He enrolled in a parenting class, but did not complete the course. Father received mental health counseling through Los Angeles County and assistance through a homeless outreach center. Father acknowledged on several occasions he could not care for M.C. because of his own mental health issues and an unstable housing situation.

In June 2012, father appeared mentally stable and had been living in an apartment for two months. But by late July, he was again living on the streets after an altercation with a roommate. He asked to have his case transferred to Los Angeles, where he was searching for employment and housing, explaining it was too difficult to travel to Orange County to visit M.C. and complete his court-ordered services.

---

[2]    The aunt ultimately failed to complete the requirements for foster placement. Father also suggested temporary placement with the maternal grandfather in Texas, but the grandfather lived with a parolee daughter (not mother) and refused to "kick her out on the street when she is doing so well."

In July 2012, father pleaded no contest to the allegations of the petition as amended. The juvenile court found the allegations to be true.

Father continued to have difficulty embracing his parental responsibilities while visiting M.C. In September 2012, father did not attempt to correct M.C.'s errant behavior or "verbally engage in any communication with the child. He . . . just stands or sits around the child." When M.C. tried to put his finger in a light socket, father did not move to protect or redirect him, and the monitor had to remove the child from the area.

Father had obtained employment, but he continued to live on the streets. He explained he could not "live in any type of shelter, or housing . . . where he is told he must follow certain rules and conditions." He stopped seeing his therapist and psychiatrist, and stopped taking his prescribed medication, asserting he no longer needed it. He had not completed any of his case plan requirements and did not visit M.C. The social worker informed father he must secure housing, maintain employment, and seek childcare for M.C. to have the child returned to his care. Father complained "this appeared to be too much."

The social worker reported in late October 2012 that 15-month old M.C. continued to have significant developmental delays and was "still exhibiting some Autistic characteristics." He also had become "very aggressive, throw[ing] things, pull[ing] hair" and "hitting people unexpectedly." She recommended adding behavioral therapy to the child's treatment regimen. Father reported feeling under stress at his job, returned to his psychiatrist and asked to resume medication for bipolar and depressive disorders. Father also enrolled in a 10-week parenting class, and received a recommendation for individual counseling. The social worker also recommended psychotherapy so father can share "feelings of frustration, anxiety, irritability" and to find "healthy ways to cope . . . with his mental health issues."

At the disposition hearing in December 2012, the juvenile court ordered reunification services for father, and approved the case plan contained in the October 18,

5

2011 social services report. The court set an 18-month review hearing for January 24, 2013.

The social worker's initial report for the review hearing recommended terminating father's reunification services. Father had completed a parent education class, but had not started individual counseling. He stopped taking medication for his mental illness, missed an appointment with his psychiatrist, and visited his mental health clinic infrequently. His mental health counselor in Los Angeles explained mental illness is chronic, and patients need ongoing therapy to function appropriately and safely. She could not say whether father was able to safely and appropriately care for M.C. at the current time.

Father had moved into an apartment in Santa Monica, but ignored the social worker's attempts to verify the residence. He continued to work full time at a restaurant. He refused to sign the case plan, and his visits with M.C. remained inconsistent. Authorized to have monitored visits two times a week, father visited M.C. about once a month. He often cancelled or failed to show up for scheduled visits, and other times arrived late, tired from a long commute, and left early. The visits were "unproductive, distant, and cold" and father did not "display any affection, nurturance, or express any words of endearment." He did not appear "to have learned any parenting skills or expectations from his parenting classes." Nor did he appear emotionally attached to M.C. He did not hug, kiss, or talk to his son. Father did not set boundaries, redirect M.C.'s aggressive behavior, or "prevent the child from possible injury during" visits.

In February 2013, the social worker reported father ignored M.C.'s caregiver during a January 30 visit and gave M.C. apple slices with skin, causing M.C. to gag because he did not know how to chew some foods. The caregiver reported father failed to take into account M.C.'s severe developmental delays and was unwilling to listen or learn. Father left the visit 30 minutes early and did not show up or call to cancel a February 6 visit. He also missed visits on February 13 and February 19.

6

In late February 2013, father's lawyer declared a conflict and the court appointed a new lawyer. The court continued the 18-month review to March 21.

In the report prepared for the March 21 hearing, the social worker noted father had not contacted the social worker or the caregiver, or visited M.C., since the last report. The foster mother reported father had angrily "accused her of writing lies in [the prior] report." In May, the social worker reported that father resumed visiting M.C., but the foster mother described the visits as "poor quality" and noted father left the visits 40 minutes early.

The review hearing commenced May 7, 2013. The current and former social workers testified, as did father. At the conclusion of the hearing, the juvenile court found M.C.'s return to father would create a substantial risk of detriment to his safety and physical or emotional well-being, and father's progress toward alleviating the causes necessitating placement had been minimal. Finding it was "futile" to provide father with further reunification services, the court scheduled a hearing to implement a permanent plan for M.C.

II

DISCUSSION

A.    *Substantial Evidence Supports the Juvenile Court's Finding that Returning M.C. to His Father Poses a Substantial Risk of Harm*

Section 366.21, subdivision (f) provides that "[t]he permanency hearing shall be held no later than 12 months after the date the child entered foster care . . . ."[3] At the permanency hearing, the court settles on a permanent plan for the child, which includes a determination of whether the child will be returned to the child's home within

---

[3]    Here, because of delay between the date M.C. was originally taken from his parents (July 2011) and entered foster care (September 2011) and the disposition hearing (December 2012), the May 2013 initial postdisposition review hearing served as the permanency review hearing.

7

the time limits of section 361.5, subdivision (a). "*[T]he court shall order the return of the child to the [parent's] physical custody . . . unless the court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.* The social worker shall have the burden of establishing that detriment. . . . The court shall also determine whether reasonable services that were designed to aid the parent or legal guardian to overcome the problems that led to the initial removal and continued custody of the child have been provided or offered to the parent or legal guardian. . . . *The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental.*" (§ 366.21, subd. (f), italics added.)

Father argues there is no evidence he "has ever abused or neglected the child. The father completed two parenting classes. Father is now fully employed, with an appropriate home for the minor. The father spoke with his psychiatrist about going off his medications, because it made working extremely difficult. Father was aware, that without a job, the child would not be returned to his care. The evidence presented to the juvenile court shows father thriving. Father . . . has held a job for over seven months; has maintained an apartment for approximately six months; has $800 in savings; travels six hours, by bus, to visit his child; attends individual counseling. These are not the actions of a debilitated parent suffering mental health issues. The fact that father has mental health issues is not substantial evidence of substantial risk of detriment to the child."

A reviewing court must uphold a juvenile court's findings and orders if they are supported by substantial evidence. (*In re Amos L.* (1981) 124 Cal.App.3d 1031, 1036-1037.) Credibility determinations and resolving conflicts in the evidence are reserved for the trier of fact. (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1226-1227.) "[W]e must indulge in all reasonable inferences to support the findings of the juvenile court [citation], and we must also '. . . view the record in the light most favorable to the

orders of the juvenile court.'" (*In re Luwanna S.* (1973) 31 Cal.App.3d 112, 114.) The appellant bears the burden to show the evidence is insufficient to support the court's findings. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

Robert Byczkowski, the social worker since February 8, 2013, testified he believed returning M.C. to his father would create a substantial risk of detriment to the child. Byczkowski explained he grew concerned when father informed him he no longer took his psychotropic medications, and claimed his psychiatrist told him he did not need to take the medications if he felt better. But father could not remember the psychiatrist's name or contact information. Byczkowski felt father's statements were "gravely concerning as they tend not to be consistent with information, training, or experiences that I have based on individuals with mental histories." The social worker noted that father did not "appear to be able to provide" his plan concerning child care. Byczkowski also emphasized father visited M.C. sporadically, and when he did visit, father failed to "appropriately or adequately parent the child" and "does not take direction or guidance offered by the caretaker or other individuals . . . ."

Barbara Flores, father's former social worker, testified she spoke with father's psychiatrist in January 2013. The psychiatrist stated she prescribed medication for father, but was unsure whether he was taking it because he missed his December 2012 appointment. Father explained he stopped taking the medication because it made him sleepy and hard for him to work. Flores noted father's mental health provider reported father was "not consistent in his mental health counseling." Flores also had "concerns about [father's] parenting ability," and believed he could not adequately supervise or protect M.C. She concluded father had not benefitted from the parenting program based on "his inability to redirect the child, engage in conversation, engage in some kind of involvement with the child during his visits." She cited his passivity and failure to parent his child appropriately, including giving M.C. apples that caused him to choke, and not supervising M.C. when he ran out of the room to an elevator. Based on his "lack of

9

compliance in completing his service plan [psychotherapy apart from his mental health program counseling, and continued medication regimen] and his parenting skills and inability to supervise correctly, the child, and the content of the visit," the social workers recommended terminating reunification services.

As related in detail above, the record contains substantial evidence that supports the trial court's detriment finding. Father's decision to skip psychiatric appointments and discontinue his prescribed medication demonstrated the child remained at risk in father's care because he did not appreciate the nature of his mental illness. Father's inconsistent visitation, and especially his passive care and supervision of M.C. during visits, also showed the child remained at risk in father's care. As the social worker reported, father demonstrated a lack of understanding of M.C.'s severe developmental delays and often demonstrated poor parenting skills, notwithstanding his completion of a parenting class. Father did not set boundaries, redirect M.C.'s aggressive behavior, or "prevent the child from possible injury during" visits. Notably, father never progressed beyond monitored visitation. Father's failure to hug, kiss or talk to his son showed he lacked an emotional attachment; at the least it showed M.C. received no emotional and loving support. As mentioned above, father acknowledged on several occasions he could not safely care for M.C. because of his own and M.C.'s issues. Nor could father's mental health counselor in Los Angeles say whether father was able to safely and appropriately care for M.C.

It is laudable that father completed a parenting program, and by May 2013, appeared to have established stable employment and housing. But given father's long history of mental illness and transience, his failure to protect M.C. shortly after the birth, father's decision to self-treat his mental illness, the extra care and supervision necessitated by M.C.'s special developmental and cognitive needs, and father's manifest failure to grasp basic parenting concepts notwithstanding the parenting class, the court

10

did not err in concluding return of M.C. to father in May 2013 would create a substantial risk of detriment to M.C.'s safety, protection, or physical or emotional well-being.

B.    *Substantial Evidence Supports the Juvenile Court's Finding Reasonable Services Were Offered or Provided to Father*

Section 361.5 provides, "Except as [otherwise] provided . . ., whenever a child is removed from a parent's . . . custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's" parent.  Where the child is under three years of age "on the date of initial removal from the physical custody of his parent, court-ordered services shall be provided for a period of six months from the dispositional hearing as provided in subdivision (e) of Section 366.21, but no longer than 12 months from the date the child entered foster care as provided in Section 361.49 unless the child is returned to the home of the parent or guardian." (§ 361.5, subd. (a)(1)(B); § 361.49 [child enters foster care at the earlier of the jurisdictional hearing or 60 days after the date he or she is initially removed from the physical custody of his or her parent or guardian.)[4]

Father contends the juvenile court erred when it found reasonable services had been offered or provided.  "Family preservation is the priority when dependency proceedings commence.  [Citation.]  'Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible." [Citation.]' [Citation.] Therefore, reasonable reunification services must usually be offered to a parent. [Citation.]  SSA must make a '"'good faith effort'"' to provide reasonable services responsive to the unique needs of each family.  [Citation.]  '[T]he plan must be specifically tailored to fit the circumstances of each family [citation], and must be

---

[4]    The court may extend services for up to 24 months from the date the child was originally removed from physical custody of the parent under special circumstances not applicable in this case.  (See § 361.5, subds. (a)(3) & (4); § 366.22, subd. (b); *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490 (*Earl L.*).)

11

designed to eliminate those conditions which led to the juvenile court's jurisdictional finding. . . .' The adequacy of SSA's efforts to provide suitable services is judged according to the circumstances of the particular case. [Citation.]" (*Earl L., supra,* 199 Cal.App.4th at p. 1501.)

We are mindful, however, "[i]n almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) "It is the job of SSA to assist parents with inadequate parenting skills in remedying the sources of the problem, not to eradicate the problem itself." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) We review the juvenile court's finding of reasonable services for substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.)

Father complains the social workers did not do enough to "get father into individual counseling." He marshals a list of alleged SSA omissions, including a failure to follow up on referrals provided to father or determine whether father was still on a waiting list for counseling. He also emphasizes SSA did not refer father to an additional parenting class, did not refer him to a parent-mentor program, never informed father he should attend domestic violence counseling, failed to contact father's mental health providers to ascertain his mental health status, did not provide a referral packet for Los Angeles County services, and did not give him bus passes after he informed social workers he had transportation problems. He argues the juvenile court should have continued the case under section 352 to provide him with "six months of family reunification services." (See *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1017.)

The operative case plan required father to cooperate with recommendations of the treating psychiatrist and follow through on any medication regime, and "take

12

medications as prescribed, on a consistent basis," and "meet with the attending psychiatrist, before terminating any medications." The case plan also required father to participate in individual, conjoint, family and/or group therapy with an SSA-approved therapist "to address issues of . . . child abuse, inappropriate/poor parenting skills, parental responsibilities & expectations, protective measures, age appropriate discipline, abandonment/separation issues, anger management, low self-esteem, childhood trauma as it relates to adult dysfunction, substance abuse, mental illness, cycle of domestic violence, co-dependency, and dynamics and consequences of dysfunctional relationships. Counseling is to continue until such time as the assigned social worker determines in consultation with the therapist that the goals of therapy have been accomplished and therapy is no longer necessary. Frequency of counseling is to be determined by the assigned social worker in consultation with the therapist."

The case plan required SSA to facilitate weekly supervised visitation, review the case plan with father and "provide referrals to appropriate resources to facilitate the [father's] compliance with the case plan," "provide in & out of county transportation passes/tickets for" father "as needed to facilitate the case plan requirements, and visitation," and "monitor [father's] cooperation and compliance with the Court-approved case plan by contacting the parents' service-providing agencies to obtain service progress information."

As noted, father contends the social workers did not do enough to "get [him] into individual counseling." Father testified Flores provided him with referrals in Santa Monica for parenting classes, counseling, and drug testing. In January 2013, he was on a waiting list for individual counseling with Santa Monica Family Services, referred by Flores. The provider told him he would have to wait for a call, but father decided to find "his own place" and started counseling in February 2013 with Alexis Litvak through Daniel's Place, which had been suggested by his caseworker, Chris Richardson, at Ocean Park Community Center. He still was receiving weekly counseling

13

at the time of the May 2013 hearing. He and Litvak "talk[ed] about pretty much everything, basically, how am I gonna deal with my son, what's my future . . . . She asks me questions." They also dealt with issues related to his mental health, including his anxiety.

According to her reports, in June 2012 Flores advised Chris Richardson, father's community center case manager, that father needed to participate "with his case plan components" including "long term individual counseling." As noted, father conceded at the hearing Flores referred him to appropriate counseling in Santa Monica. But as of October 2012 father stated he had "not participated in any case plan activities, and cannot do so because of work." Flores encouraged him to "return to the location he initially was attending for parent education, or to return to," Richardson "for referrals to parent education, and individual counseling." Flores also urged him to return to therapist Amy Byrne, who was willing to provide additional referrals for separate psychotherapy with a clinician outside the county's mental health agency. Flores also advised father's psychiatrist, Dr. Fine, that she wanted father to attend psychotherapy to help him deal with "intimate relationships, peer relationships, substance abuse, co-dependency, unresolved childhood trauma, and/or poor parenting skills, responsibilities and expectations." Fine agreed to provide father with a list of psychotherapists. Flores stated she would explore resources for father to help pay for these services, but that "he must take the initiative to enroll, and demonstrate his commitment to staying involved and participating consistently." In November 2012, father's parenting instructor, Angelie McCord, encouraged father to enroll in individual counseling as well. In January, Flores again advised father "he needed to attend individual counseling with a different therapist [other than Byrne] to discuss other critical issues that do not involve his mental health."

The record reflects social workers did review case plan responsibilities with father, referred him to resources near his residence, and also worked through father's longstanding mental health providers and case workers to refer him to appropriate

14

psychotherapy. As noted, father ultimately obtained counseling with Alexis Litvak, who was suggested by Richardson. SSA's efforts concerning individual counseling were not unreasonable.

Father also complains SSA did not refer father to an additional parenting class or parent mentoring. Flores referred father to parenting education in Santa Monica. Father testified he attended nine of ten parenting classes before dropping out, and then re-enrolled and completed another 10-week parenting class. Father believed the second course "was pretty much a waste of time because" it largely duplicated the earlier class. Nothing suggests the course referred did not contain the appropriate components of an effective parenting education program, or that another class or mentoring would have helped. Father simply appeared unable to grasp the concepts taught. SSA's efforts concerning parenting education were not unreasonable.

Father complains SSA did not refer him to a domestic violence or personal empowerment program. Flores testified she "believed" she referred father at some point to a program in Orange County, but apparently did not refer him to a Los Angeles County program. Flores also testified father's failure to participate in an empowerment program (PEP) was not the reason for her recommendation against M.C.'s return. Although Byczkowski testified it would have been "beneficial for father to participate in that type of service," domestic violence between the parents was not at the heart of this case. Any failure to refer or follow up with father concerning a PEP program did not deny father the reasonable services he needed to regain custody of M.C.

Father also contends the social workers failed to contact father's mental health providers to ascertain his mental health status. Flores testified she did speak with Dr. Fine, who informed her about father medication's status. Fine did not have much specific information about father. Neither she nor father's former county mental health counselor, Amy Byrne, appeared very forthcoming with information, perhaps because of confidentiality concerns. It is unclear whether or when father advised the social workers

15

about his counseling with Litvak to allow SSA to solicit input. In any event, while it would have desirable to have assessments from father's mental health providers, nothing suggests the providers had information favorable to father's position. SSA's failure to obtain further details of his condition did not deny father reasonable services.

Father also asserts social workers did not give him bus passes. In her December 2011 report, Flores noted SSA was supplying out of county bus passes and asked the court "to correct the wording on the minute order" to allow father to continue to receive out of county passes. Father testified at the hearing in May 2013 he continued to make the three-hour trek from Santa Monica to Orange on the bus and train, but did not testify SSA failed to supply him with bus passes. Although he missed visits for work-related and other reasons, nothing suggests he did not have access to transportation.

Finally, we reject father's suggestion that "unofficial services" offered to him during the 17-month predisposition period cannot be considered because they were "voluntary" rather than court-ordered. Here, at the detention hearing in July 2011, the court ordered SSA to provide "reunification services as soon as possible." Because of time limits on out of custody placement, especially with young children, it is necessary to start reunification efforts immediately. It would frustrate the statutory purpose to speedily resolve dependency issues if those efforts could not be considered in determining whether SSA provided reasonable services.

III

DISPOSITION

The petition from the order terminating reunification services is denied, as is the request for a stay of the section 366.26 hearing set for September 20, 2013.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


FYBEL, J.